The STATE of Ohio, Appellee,

v.

WILLIAMS, Appellant.

[Cite as *State v. Williams*, 179 Ohio App.3d 584, 2008-Ohio-6245.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22532.

Decided Nov. 26, 2008.

586

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, for appellee.

Anthony Comunale, for appellant.

DONOVAN, Judge.

{¶ 1} Thonex Williams appeals from a judgment of the Montgomery County Court of Common Pleas, which found that Williams was incompetent to stand trial and unrestorable to competency within the statutory time limits, retained jurisdiction over him under R.C. 2945.39, and ordered that Williams be committed to the Timothy B. Moritz Forensic Unit of the Columbus Campus of Twin Valley Behavioral Healthcare ("Twin Valley"). Williams challenges the trial court's retention of jurisdiction, arguing that R.C. 2945.39 is unconstitutional. For the following reasons, the trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

I

{¶ 2} On December 19, 2005, Williams was indicted for one count of possession of crack cocaine, two counts of gross sexual imposition, one count of unlawful sexual conduct with a minor, and one count of rape. Williams's counsel promptly requested an evaluation of Williams's current mental condition and of his mental condition at the time of the offenses. On the same date, Williams entered a written plea of not guilty by reason of insanity.

{¶ 3} Williams was examined by the Forensic Psychiatry Center for Western Ohio, and Williams subsequently stipulated to the contents of the psychiatric report. On March 1, 2006, the trial court found that Williams was incompetent to stand trial and that there was a substantial probability that he could be restored

to competency within the one-year statutory time limit set forth in R.C. 2945.38. The court committed Williams to Twin Valley for restorative treatment, including appropriate medication. After a six-month review, Williams remained incompetent to stand trial and was found to be a mentally ill person subject to hospitalization by court order. Because the maximum time for treatment had not expired, the court ordered that Williams receive continued treatment at Twin Valley.

{¶ 4} On February 15, 2007, Twin Valley submitted an evaluation summary report indicating that Williams remained incompetent to stand trial and that, despite one year of efforts at restoration, Williams "is not restorable within the statute of limitations." At a hearing on February 26, 2007, the state requested that the trial court retain jurisdiction over Williams under R.C. 2945.39. Williams orally requested and subsequently filed a motion to dismiss the indictment, arguing that R.C. 2945.39 violated his rights to equal protection and due process. The trial court overruled Williams's motion to dismiss.

{¶ 5} In November 2007, the trial court held a hearing to determine whether to retain jurisdiction over Williams. The state focused on the charge of rape, a first-degree felony. The court found by clear and convincing evidence that Williams committed the offense for which he was indicted (rape), that Williams was a mentally ill person subject to hospitalization by court order, that Williams was incompetent to stand trial, and that the statutory time limit for restoration treatment had expired. The court ordered Williams to remain hospitalized at Twin Valley.

{¶ 6} Williams appeals, raising three assignments of error, each of which challenges the constitutionality of R.C. 2945.39.

## II

{¶ 7} We begin by reviewing the commitment procedures at issue in this case.

A. *Retention of jurisdiction by the criminal court*

{¶ 8} The pretrial commitment of an incompetent criminal defendant is governed by R.C. 2945.38, 2945.39, 2945.401, and 2945.402. This case focuses on R.C. 2945.39, which addresses the retention of jurisdiction by the trial court to commit an incompetent defendant who is not restorable to competency within the statutory time limitations.

{¶ 9} R.C. 2945.39 applies only to certain felony defendants. In order to fall within the scope of R.C. 2945.39, the defendant's most serious charge must be either (1) aggravated murder, murder, or an offense of violence for which a sentence of death or life imprisonment may be imposed; (2) an offense of violence

that is a felony of the first or second degree;[1] or (3) a conspiracy to commit, an attempt to commit, or complicity in the commission of one of the above-named offenses. See R.C. 2945.38(C)(1).

{¶ 10} Under R.C. 2945.38, a trial court may commit, for up to one year, a defendant charged with one of these serious felony offenses who has been found to be incompetent to stand trial, provided that there is a substantial probability that he will become competent to stand trial within one year with a course of treatment. If there is no substantial probability that the defendant will become competent to stand trial within one year, or if at the end of one year of restorative treatment the defendant has not been restored to competency, the trial court has two options. Id. First, the court or the prosecutor may seek civil commitment of the defendant through the probate court. Second, the court may retain jurisdiction over the defendant under R.C. 2945.39 if the court finds, by clear and convincing evidence, both that (1) the defendant is a mentally ill person subject to hospitalization by court order or is a mentally retarded person subject to institutionalization by court order and (2) he committed the offense with which he was charged. R.C. 2945.39(A)(2).

{¶ 11} The phrase "mentally ill person subject to hospitalization by court order" means "a mentally ill person who, because of the person's illness:

{¶ 12} "(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

{¶ 13} "(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

{¶ 14} "(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person in unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or

---

1. An "offense of violence" is defined in R.C. 2901.01(A)(9). An offense of violence that is a first- or second-degree felony includes violations of R.C. 2903.01 (aggravated murder), R.C. 2903.02 (murder), R.C. 2903.03 (voluntary manslaughter), R.C. 2903.04(A) (involuntary manslaughter), R.C. 2903.11 (felonious assault), R.C. 2903.15 (permitting child abuse which results in a death), R.C. 2905.01 (kidnapping), R.C. 2907.02 (rape), R.C. 2909.02 (aggravated arson), R.C. 2909.24 (terrorism), R.C. 2911.01 (aggravated robbery), R.C. 2911.02(A)(1) and (2) (robbery), R.C. 2911.11 (aggravated burglary), R.C. 2911.12(A)(1) and (2), R.C. 2921.34 (escape), R.C. 2923.161 (improperly discharging a firearm at or into a habitation), and R.C. 2919.22(B)(1) (endangering children).

{¶ 15} "(4) Would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person." R.C. 5122.01(B).

{¶ 16} Because Williams was alleged to be a mentally ill person, not a mentally retarded person, we will address only the requirements for mentally ill persons. Likewise, our discussion of civil commitment through the probate court will address only R.C. Chapter 5122, which concerns the mentally ill.

{¶ 17} If the trial court fails to make both of the required findings under R.C. 2945.39(A)(2) by clear and convincing evidence (or if the defendant has been charged with a misdemeanor or a felony that does not fall under R.C. 2945.38(C)(1)), the trial court must dismiss the indictment, information, or complaint against the defendant. R.C. 2945.39(C). At that juncture, the defendant would be discharged unless the prosecutor sought commitment through the probate court under R.C. Chapter 5122 or 5123.

{¶ 18} If the trial court determines that it will retain jurisdiction over the defendant under R.C. 2945.39, the trial court must commit the defendant to "a hospital operated by the department of mental health, a facility operated by the department of mental retardation and developmental disabilities, or another medical or psychiatric facility, as appropriate." R.C. 2945.39(D)(1). In determining the place and nature of the commitment, the court must order the least-restrictive alternative available that is consistent with public safety and the welfare of the defendant, giving preference to protecting public safety. R.C. 2945.39(D)(1).

{¶ 19} All changes to commitment, including termination of commitment, must be made by court order. R.C. 2945.401(B).

{¶ 20} The hospital must report periodically to the trial court whether the defendant remains a mentally ill person subject to hospitalization by court order and whether he remains incompetent to stand trial. R.C. 2945.401(C). The reports must be made after six months and every two years thereafter. Id. The court must hold a hearing on continued commitment within 30 days of the report. Id. If more than six months have passed since the last hearing, the defendant may request a hearing on a change in the conditions of confinement. Id. Hearings are open to the public. R.C. 2945.401(F), incorporating R.C. 2945.40(D).

{¶ 21} The chief clinical officer may recommend less restrictive confinement or termination of commitment. R.C. 2945.401(D). If less restrictive confinement is recommended, the prosecutor is given an opportunity to request a hearing on the recommendation. R.C. 2945.401(D)(1)(a). If termination is recommended, the

trial court and a local forensic center must be notified. R.C. 2945.401(D)(1)(b). The local forensic center must also evaluate the defendant and provide a report. Id. If the local forensic center disagrees with the recommendation, the chief clinical officer, after consideration of the forensic center's decision, shall either withdraw, proceed with, or modify and proceed with the recommendation. R.C. 2945.401(D)(1)(b)(i). The prosecutor may also seek an independent expert evaluation of the defendant's mental condition. R.C. 2945.401(D)(1)(c). The trial court may either approve, disapprove, or modify the chief clinical officer's recommendation. R.C. 2945.401(I).

{¶ 22} The commitment of a defendant finally terminates (1) when the court determines that he is no longer a mentally ill person subject to hospitalization by court order, (2) upon the expiration of "the maximum prison term or term of imprisonment that the defendant or person could have received if the defendant or person had been convicted of the most serious offense with which the defendant or person is charged," or (3) the court determines that he is competent to stand trial and is no longer a mentally ill person subject to hospitalization by court order. R.C. 2945.401(J).

{¶ 23} If the defendant's commitment is terminated because the maximum period of confinement based on his offense has expired, the prosecutor may then seek civil commitment through the probate court. R.C. 2945.401(A).

B. *Civil commitment through the probate court*

{¶ 24} Civil commitment of a mentally ill person through the probate court is governed by R.C. Chapter 5122.

{¶ 25} Under R.C. Chapter 5122, a person may be involuntarily committed if, after a full hearing, the person is found by clear and convincing evidence to be a mentally ill person subject to hospitalization by court order, as defined by R.C. 5122.01(B). R.C. 5122.15. Full hearings under R.C. 5122.15 are closed to the public, unless requested by defendant's counsel.

{¶ 26} Initially, the court may commit the individual for a period not to exceed 90 days. Commitment shall be at (1) a hospital operated by the department of mental health if the respondent is committed pursuant to section 5139.08 of the Revised Code (dealing with children in the custody of the Department of Youth Services); (2) a nonpublic hospital; (3) the veterans' administration or other agency of the United States government; (4) a board of alcohol, drug addiction, and mental health services or agency the board designates; (5) private psychiatric or psychological care and treatment; or (6) any other suitable facility or person consistent with the diagnosis, prognosis, and treatment needs of the respondent. R.C 5122.15(C). Placement should be at the least restrictive alternative available and consistent with treatment goals. R.C. 5122.15(E).

{¶ 27} Continued commitment may be sought after the initial 90–day period. R.C. 5122.15(H). The probate court must hold a hearing on the petition for continued commitment and hold additional hearings at least every two years thereafter. If six months have passed since the last hearing, the individual held may request a hearing on continued commitment. Id.

{¶ 28} Before an involuntary patient may be transferred to a more restrictive setting, the chief clinical officer must file a motion with the court requesting the court to amend its order of placement. R.C. 5122.20.

{¶ 29} The chief clinical officer must examine the patient at least every 30 days. R.C. 5122.21(A). If the conditions justifying involuntary commitment no longer apply, the chief clinical officer may discharge the patient; no court approval is required. R.C. 5122.21(B).

### III

{¶ 30} Upon review of R.C. 2945.39, the trial court found that R.C. 2945.39 was constitutional. The trial court found that the statute sought "to accommodate the need of society to be protected from criminal defendants who are deemed to be a danger to themselves and/or society, provided that the person is subject to hospitalization by court order or * * * institutionalization by court order." Although the court recognized that the finding that the defendant committed the offense "smacks of an adjudication on the merits of the criminal indictment," it held that the finding served two purposes: (1) to allow the defendant to attack the sufficiency of the indictment and argue defenses that exonerate him and (2) to provide a second level of review, beyond the criminal indictment, that the defendant is in fact a danger to himself and/or society.

{¶ 31} The trial court rejected Williams's argument that the "clear and convincing" standard of proof violated his constitutional rights. It concluded that the standard "is not so much a lessening of the criminal standard, as it is a consistency with the commonly accepted civil commitment procedure in criminal cases and in cases in which commitment is sought of those not criminally charged." The court also concluded that the maximum length of confinement "does not so much indicate the punitive nature of the commitment, but rather the extent to which the individual and society are endangered by him." The court further stated:

{¶ 32} "[U]nder Revised Code § 2945.401, should the court retain jurisdiction for this longer period of time, the statute permits changes of confinement and accounts for changes in conditions, including termination of defendant's commitment if he no longer meets the § 2945.39(A)(2)(b) criterion. The Court finds that the scheme adopted in § 2945.39 is less a denigration of the constitutional rights

of the criminally accused as it is a transfer of authority for ordering civil commitment from the probate court to the criminal court for purposes of determining the danger of such Defendant to himself and to the public for purposes of civil commitment, in this case of persons charged with criminal offenses."

{¶ 33} On appeal, Williams claims that the hearing by which the court retained jurisdiction under R.C. 2945.39 was conducted in an unconstitutional manner and that R.C. 2945.39 violates his rights to equal protection and due process. We will address these issues in an order that facilitates our analysis.

{¶ 34} Before turning to the issues raised, we note that statutes enjoy a strong presumption of constitutionality. *State v. Cook* (1998), 83 Ohio St.3d 404, 409, 700 N.E.2d 570. " 'An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible.' " Id., quoting *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

IV

{¶ 35} We begin with Williams's third assignment of error, which states:

{¶ 36} "Proceedings under [R.C.] 2945.39 violate both appellant's equal protection and due process rights."

{¶ 37} In his third assignment of error, Williams claims that the trial court's proceedings under R.C. 2945.39 were unconstitutional because he was not afforded the constitutional protections that defendants are normally given in a criminal case. These protections include the rights to effective assistance of counsel, proof beyond a reasonable doubt, speedy trial, jury trial, suppression of evidence, and protection against cruel and unusual punishment. The state responds that R.C. 2945.39 imposes civil commitment and that the rights afforded to criminal defendants in a criminal prosecution do not apply.

{¶ 38} Whether a statute is criminal or civil in nature is a matter of statutory interpretation. *State v. Cook* (1998), 83 Ohio St.3d 404, 700 N.E.2d 570. The Ohio Supreme Court has adopted an intent-effects test for delineating between criminal and civil statutes. Id. "In applying the intent-effects test, this court must first determine whether the General Assembly, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other' and second, where the General Assembly 'has indicated an intention to establish a civil penalty, * * * whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.' " Id. at 415, 700 N.E.2d

570, quoting *United States v. Ward* (1980), 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742.

{¶ 39} As noted in *Cook*, the United States Supreme Court applied the intent-effects test in *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501. In that case, the court reviewed whether Kansas's Sexually Violent Predator Act constituted criminal proceedings and whether involuntary commitment under the Act was punitive. The Act established procedures for the civil commitment of persons who, due to a "mental abnormality" or a "personality disorder," were likely to engage in "predatory acts of sexual violence." Id. at 350, 117 S.Ct. 2072, 138 L.Ed.2d 501, citing Kan. Stat. Ann. 52–29a01 et seq. A sexually violent predator was defined as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." Hendricks was incarcerated for a sexually violent offense and was slated for release shortly after the Act took effect. Hendricks argued, in part, that his commitment under the Act violated the Double Jeopardy Clause and the Constitution's ban on ex post facto laws. He asserted that the Act established criminal proceedings and, consequently, confinement under the Act was punitive.

{¶ 40} In rejecting Hendricks's claim that the Kansas statute was criminal in nature, the Supreme Court first noted that the Kansas legislature intended to create civil proceedings as evidenced by the Act's placement within the Kansas probate code, not the criminal code. Second, the court found that the Act did not implicate either of the "primary objectives of criminal punishment: retribution or deterrence." The court concluded that the Act was not retributive because it did not "affix culpability for prior criminal conduct" and, instead, used such conduct only for evidentiary purposes—either to demonstrate that a "mental abnormality" existed or to support a finding of future dangerousness. The court further noted that the Act did not make a criminal conviction a prerequisite for commitment in that persons who had been absolved of criminal responsibility may nonetheless be subject to confinement. Third, the court stated that, unlike a criminal statute, no finding of scienter was required to commit an individual who was found to be a sexually violent predator. Nor did the Kansas legislature intend for the Act to act as a deterrent. The Supreme Court rejected the contention that the potential for indefinite commitment and lack of available treatment rendered the confinement punitive. The court reasoned: "If detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." (Emphasis sic.) Id. at 363, 117 S.Ct. 2072, 138 L.Ed.2d 501. The court concluded:

{¶ 41} "Where the State has 'disavowed any punitive intent'; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent. We therefore hold that the Act does not establish criminal proceedings and that involuntary confinement pursuant to the Act is not punitive." Id. at 368–69, 117 S.Ct. 2072, 138 L.Ed.2d 501.

{¶ 42} We find *Hendricks* to be distinguishable.

{¶ 43} The General Assembly did not articulate its intent in enacting R.C. 2945.39. Contrast R.C. 2950.02(A), Ohio's sex-offender-registration statute, which makes findings and states the legislature's intent. Rather, we must glean the legislative purpose from the nature of its provisions. Unlike the Kansas statute, R.C. 2945.39 is part of the penal code. Although the legislature's placement of R.C. 2945.39's commitment procedure in the criminal code rather than the probate code is not dispositive, see *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570 (finding that Ohio's sexual-offender-registration statute, which is part of the criminal code, is civil in nature), the statute does not indicate that it has a civil purpose despite its placement in the criminal code, and its language reveals both criminal and civil purposes.

{¶ 44} Through R.C. 2945.39, the General Assembly chose to provide a separate commitment procedure as part of the underlying criminal action. The determination whether the court should retain jurisdiction, the placement of the defendant in a treatment facility, changes to the defendant's placement, review hearings on the defendant's mental status, and the termination of the defendant's commitment are all made by the trial court as part of the ongoing criminal case.

{¶ 45} To be sure, one purpose of confinement under R.C. 2945.39 is to protect the public from individuals who may be particularly dangerous as shown by the offenses with which they were charged, a legitimate civil goal. However, the commitment procedures in R.C. 2945.39 apply only to defendants who likely committed the offenses for which they are charged yet are incompetent to stand trial and cannot be punished through the criminal justice system. Unlike the statutes in *Hendricks* and *Cook*, R.C. 2945.39 does not cover mentally ill individuals who have been convicted of the same offenses, thus suggesting that protecting the public from dangerous mentally ill persons is secondary to punishing those dangerous mentally ill persons who cannot be tried.

{¶ 46} Consistent with that approach, the criminal indictments against the incompetent defendants confined under R.C. 2945.39 remain pending, unlike the

indictments against incompetent criminal defendants who are referred to the probate court for civil commitment. For incompetent defendants held under R.C. 2945.39, periodic reviews must include an opinion as to whether the defendant remains incompetent to stand trial, R.C. 2945.401(C), and if after a hearing the defendant is found to be competent to stand trial, the defendant may be tried for the offenses. Thus, an incompetent defendant's commitment under R.C. 2945.39 is not solely to restrain and provide treatment for dangerous mentally ill defendants, but also to confine the defendant as part of the pending underlying criminal action in the event that the defendant regains competency to be tried.

{¶ 47} Finally, the criminal nature of an incompetent defendant's confinement under R.C. 2945.39 is demonstrated by linking the maximum length of detention under R.C. 2945.39 to the maximum criminal sentence that the defendant could have received if convicted of the most serious offense with which he was charged. Although a defendant may be released prior to that date if the trial court determines that he is no longer a mentally ill person subject to hospitalization by court order, the defendant's commitment must be terminated upon reaching the length of the maximum sentence regardless of whether the defendant remains a dangerous mentally ill person subject to hospitalization by court order. Thus, the maximum length of confinement under R.C. 2945.39 bears little, if any, relationship to the purposes of civil commitment, i.e., to confine and treat mentally ill individuals until they are cured. Moreover, by creating a maximum length of confinement based on the criminal penalty, a defendant's charged offense is not used solely as evidence of the defendant's dangerousness or mental illness for purposes of determining whether commitment is appropriate.

{¶ 48} Tellingly, if an incompetent defendant is released due to the expiration of the maximum commitment period under R.C. 2945.39, the prosecutor may then seek civil commitment through the probate court. Thus, the statutory scheme strongly suggests that the commitment procedures under R.C. Chapter 5122 are adequate to address society's interest in confining dangerous mentally ill persons and that the prior commitment under R.C. 2945.39 was largely punitive.

{¶ 49} Accordingly, although R.C. 2945.39 attempts to accomplish some of the same goals as civil commitment, the commitment procedures of R.C. 2945.39 reflect an overriding intent to confine incompetent defendants who have been charged with serious felonies as if they had been convicted or until they can be tried. Accordingly, we conclude that R.C. 2945.39 is criminal, not civil, in nature. Because of the criminal nature of R.C. 2945.39, Williams was entitled to the same protections afforded a criminal defendant during his hearing under R.C. 2945.39.

{¶ 50} The third assignment of error is sustained.

## V

{¶ 51} Williams's first assignment of error states:

{¶ 52} "The trial court's decision and Ohio Revised Code section 2945.39 violated appellant's equal protection rights as afforded by the United States and the Ohio Constitutions."

{¶ 53} In his first assignment of error, Williams claims that R.C. 2945.39 denies him the equal protection of the laws because the commitment procedures under R.C. 2945.39 differ significantly from the civil-commitment procedures set forth in R.C. Chapter 5122.

{¶ 54} The constitutional guarantee of equal protection requires that laws operate equally upon persons who are alike in all relevant respects. See *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 20. When suspect classes are not involved, the equal-protection clause permits class distinctions in legislation if the distinctions bear some rational relationship to a legitimate government objective. *State ex rel. Vana v. Maple Hts. City Council* (1990), 54 Ohio St.3d 91, 92, 561 N.E.2d 909, citing *Clements v. Fashing* (1982), 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508. "Under rational basis scrutiny, legislative distinctions are invalid only if they bear no relation to the state's goals, and no ground can be conceived to justify them." *State v. Harding*, Montgomery App. No. 20801, 2006-Ohio-481, 2006 WL 267323, ¶ 71, citing *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 353, 639 N.E.2d 31.

{¶ 55} In this case, Williams claims that the procedures and standards under R.C. 2945.39 differ significantly from those found in the civil-commitment statutes. First, he notes that R.C. 2945.39 requires an additional threshold determination, by clear and convincing evidence, that the incompetent person committed the offense for which he had been accused. Second, Williams states that the procedures for discharge under R.C. 2945.39 are more onerous. Williams asserts that the presence of an indictment against a mentally ill person is inadequate to justify these different commitment procedures.

{¶ 56} In response, the state argues that R.C. 2945.39(A)(2) has a stricter standard, not a more lenient one, for commitment of a person found incompetent to stand trial than the standard civil-commitment statute. The state points out that commitment under R.C. 2945.39 ends when the individual no longer qualifies for hospitalization under the same standard applied in the standard civil-commitment statute and that, unlike the civil-commitment statute, which has no maximum period of confinement, commitment under R.C. 2945.39 is limited to the maximum prison term that the defendant could have received if the defendant had been convicted of the most serious offense with which he was charged. Although the state acknowledges Williams's argument that he cannot be dis-

charged by the chief clinical officer, the state asserts that he is protected in other ways, such as by the requirements that he be placed in the least-restrictive-commitment alternative consistent with public safety, that the institution report periodically to the court, and by allowing hearings on the defendant's competency upon request.

{¶ 57} In support of his assertion that R.C. 2945.39 violates his right to equal protection, Williams relies primarily upon *Jackson v. Indiana* (1972), 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435. In that case, Jackson was a mentally defective deaf mute with the mental level of a preschool child and limited communication skills. The trial court had instituted competency proceedings and determined that Jackson "lack[ed] comprehension sufficient to make his defense." Jackson was committed to the Department of Mental Health until he "was sane." On appeal before the United States Supreme Court, Jackson argued, inter alia, that his commitment under Indiana's statute deprived him of equal protection and violated his right to due process. The United States Supreme Court agreed with both contentions.

{¶ 58} Addressing Jackson's equal protection argument, the court began by noting that it had previously ruled that a criminal conviction and imposition of sentence "are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others." Id. at 724, 92 S.Ct. 1845, 32 L.Ed.2d 435, citing *Baxstrom v. Herold* (1966), 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620. Turning to Indiana's various commitment statutes, the court noted that the procedures were substantially similar—they all provided notice; examination by two doctors; a full judicial hearing with the same rights to counsel, to introduce evidence, and to cross-examine witnesses; a determination by the court alone; and appellate review. The Supreme Court found significant, however, that the state had a different, more lenient standard to commit Jackson and that the circumstances justifying his release were substantially different. The court stated that it could not "conclude that pending criminal charges provide a greater justification for different treatment than conviction and sentence." It thus held that "by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by § 22–1209 or 22–1907, Indiana deprived [Jackson] of equal protection of the laws under the Fourteenth Amendment."

{¶ 59} In *Baxstrom*, cited in *Jackson*, the Supreme Court had addressed whether an individual was denied equal protection when he continued to be held at the state hospital for male criminals who were declared insane while serving

their sentences, even though he had completed his criminal sentence. The court held that Baxstrom was denied equal protection by New York's statutory procedure, under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. The court reasoned: "Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill at all. For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments." Id. at 111–12, 86 S.Ct. 760, 15 L.Ed.2d 620.

{¶ 60} The Supreme Court further held that Baxstrom was denied equal protection when he was not afforded the same procedures for determining the hospital to which he was committed. Under New York law, individuals generally could be civilly committed to hospitals maintained by the Department of Correction only after judicial proceedings had been held in which it was determined that the person was so dangerously mentally ill that his presence in a civil hospital was dangerous to the safety of other patients or employees or to the community. Those, like Baxstrom, who were committed upon the expiration of their criminal sentence, could be committed at such a hospital if the judge determined that the person "may require care and treatment in an institution for the mentally ill." The court noted that commitment to a hospital run by the Department of Corrections was more restrictive than commitment to a hospital run by the Department of Mental Hygiene.

{¶ 61} In concluding that Baxstrom's equal protection rights had been violated by the different standard for placing Baxstrom at a state hospital, the Supreme Court rejected the argument that it was reasonable to classify persons in Baxstrom's class together with those found to be "dangerously insane" since such persons were not only insane but had proven criminal tendencies as shown by their past criminal records. The court stated: "The capriciousness of the classification employed by the State is thrown sharply into focus by the fact that the full benefit of a judicial hearing to determine dangerous tendencies is withheld only in the case of civil commitment of one awaiting expiration of penal sentence. A person with a past criminal record is presently entitled to a hearing on the question whether he is dangerously mentally ill so long as he is not in prison at the time civil commitment proceedings are instituted. Given this distinction, all semblance of rationality of the classification, purportedly based upon criminal propensities, disappears."

{¶ 62} We read *Jackson* and *Baxstrom* to hold that individuals who are civilly committed must be afforded the same procedural and substantive protections, regardless of whether they are incompetent to stand trial, presently incarcerated, or have no criminal history. However, those committed may be subjected to different types of custodial or medical care based upon medical need or dangerousness.

{¶ 63} Turning to the statutes before us, both R.C. 2945.39 and R.C. Chapter 5122 concern the commitment of individuals who are mentally ill persons subject to hospitalization by court order. Compare R.C. 2945.39 with R.C. 5122.15. In that respect, both commitment schemes concern individuals who have been found to be dangerous to themselves or to others. Moreover, R.C. 2945.39 and R.C. Chapter 5122 use the same standard for determining whether a person is a mentally ill person subject to hospitalization by court order. R.C. 2945.39, however, requires the court to make an additional determination that the defendant committed the offense with which he was charged. Because R.C. 2945.39 imposes an additional finding in order to commit an individual under that statute, we agree with the state that R.C. 2945.39(A)(2) has a stricter, not a more lenient, standard for the court to determine whether an incompetent defendant should be committed. Accordingly, the portion of R.C. 2945.39 that sets forth the standard for determining whether the incompetent defendant is subject to commitment does not violate an incompetent defendant's equal protection rights.

{¶ 64} As argued by Williams, there are substantial differences between R.C. 2945.39 and R.C. Chapter 5122 in the nature of the commitment and the release of individuals. As detailed above, commitment through the probate court involves a shorter period of commitment prior to the first review hearing, the placement is based on the least restrictive alternative without any emphasis on public safety, and the termination of commitment is determined solely by the chief clinical officer. Commitment under R.C. 2945.39 is substantially more restrictive, there are significantly more procedures for transferring the defendant to a less restrictive commitment, and termination of commitment involves a review by the local forensic center and court approval.

{¶ 65} Although substantial differences exist, the differences result in a violation of Williams's equal protection rights only if there is no rational relationship to a legitimate government objective. The state asserts that "[t]hese differences are justified by the State's interest in restraining those who are not only mentally ill and subject to hospitalization, but who have also committed a serious crime."

{¶ 66} We agree with the state that the state has an interest in confining individuals who are mentally ill and dangerous. The state may differentiate between mentally ill persons based on a showing that certain individuals pose a

greater danger. To that end, a determination that an individual has already committed a serious offense of violence may be probative as to that individual's dangerousness. However, R.C. 2945.39—as with the statute in *Baxstrom*—applies only to individuals who have been accused of a serious offense of violence. It does not apply to individuals who have been convicted of the same offense or have a history of committing that offense but are not under indictment. In that respect, R.C. 2945.39 cannot reasonably effectuate the goal of providing more restrictive commitment to those who have committed dangerous crimes.

{¶ 67} Finally, we see no rational basis for the substantially different procedures concerning termination of commitment. Under the civil-commitment scheme, the chief clinical officer may discharge a patient upon finding that the individual is no longer a mentally ill person subject to hospitalization by court order. (If the patient is under indictment, a sentence of imprisonment, a community control sanction, a postrelease control sanction, or on parole, the chief clinical officer may discharge the patient only after giving ten days written notice of his intent to discharge to the court having criminal jurisdiction over the patient.) Unlike the multifaceted procedures of R.C. 2945.401, no court authorization is required for discharge under R.C. Chapter 5122. In our view, once a person has been determined no longer to be a mentally ill person subject to hospitalization by court order, the state has no interest in continuing the person's commitment. Because both R.C. 2945.39 and R.C. Chapter 5122 concern persons who were deemed dangerous to themselves or to others, we see no reasonable basis for providing more onerous procedures, with the attendant delay, for terminating the confinement of individuals under indictment for serious felony offenses, and these procedures are contrary to *Jackson*.

{¶ 68} The first assignment of error is sustained.

## VI

{¶ 69} Williams's second assignment of error states:

{¶ 70} "The trial court's decision and Ohio Revised Code section 2945.39 violated appellant's due process rights as afforded by the United States and the Ohio Constitutions."

{¶ 71} In Williams's second assignment of error, he claims that his commitment by the criminal court under R.C. 2945.39 violates his right to due process because the *retention of the criminal indictment and the length of the involuntary commitment are not reasonably related to the purpose for which he was committed.*

{¶ 72} In *Jackson*, the United States Supreme Court held that the indefinite commitment of a defendant solely on account of his incompetency to

stand trial violated the Due Process Clause. 406 U.S. at 731, 92 S.Ct. 1845, 32 L.Ed.2d 435. In so holding, the court stated that without a finding of dangerousness, an individual cannot be indefinitely committed. "At the least, due process requires that the nature and duration of commitment bear some reasonable relationship to the purpose for which the individual is committed." Id. at 738, 92 S.Ct. 1845, 32 L.Ed.2d 435. The court thus held:

{¶ 73} "[A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." Id.

{¶ 74} In accord with *Jackson,* the Supreme Court of Ohio, in the context of a petition for a writ of habeas corpus, held that an individual who had been held for 11 years solely because he was incompetent to stand trial was denied due process and equal protection. *Burton v. Reshetylo* (1974), 38 Ohio St.2d 35, 67 O.O.2d 53, 309 N.E.2d 907. The court recognized that "[d]ue process requires that the duration of [Burton's] commitment must bear a reasonable relationship to the purpose behind it." Id. at 43, 67 O.O.2d 53, 309 N.E.2d 907. Because Burton was being held indefinitely solely because of his incapacity to proceed to trial, the court concluded that Burton's due process rights had been violated. The court also noted that Ohio had procedures for the continued commitment of convicted persons under then existing R.C. 5125.08 and 5125.09. Under those statutes, a convicted person was entitled to the full panoply of rights accorded to persons under civil commitment. (In addition, the Supreme Court held, citing *Baxstrom,* that Burton's equal protection rights were violated when there was no corresponding procedure that applied to him and he was therefore denied the same procedural protections. Id. at 45–46, 67 O.O.2d 53, 309 N.E.2d 907.)

{¶ 75} More recently, the Supreme Court of Ohio held that the former version of R.C. 2945.38, which set a mandatory minimum length of time during which a defendant must be treated for restoration to competency, violated a defendant's right to due process because the defendant was to be treated for a mandatory period regardless of whether the defendant would attain competency to stand trial in the foreseeable future. *State v. Sullivan* (2001), 90 Ohio St.3d 502, 739 N.E.2d 788. The court commented in a footnote that "if the trial court finds that there is not a substantial probability that appellee will attain competency to stand trial within one year of treatment, then the court must dismiss the indictment

against appellee." Id. at 509, 739 N.E.2d 788, fn. 4. The court recognized that an affidavit may be filed with the probate court for civil commitment. Id.

{¶ 76} In several cases, the United States Supreme Court has found that a convicted person could not be committed for longer than the maximum criminal sentence without being granted the same procedural safeguards as those individuals committed under the civil-commitment statutes. See *Baxstrom*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620; *McNeil v. Director, Patuxent Institution* (1972), 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719; *Humphrey v. Cady* (1972), 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394. But see *Jones v. United States* (1983), 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (holding that a person acquitted as not guilty by reason of insanity may be committed until such time as he has regained his sanity or is no longer a danger to himself or society and that his confinement is not constitutionally limited by the maximum sentence). We emphasize that these cases involved persons who had been convicted of the offenses, and the cases arose in the context of postconviction confinement in which the state sought to hold the defendant beyond the length of his sentence.

{¶ 77} Where pretrial confinement is involved, courts have limited "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future" by the maximum length of the criminal sentence that could be imposed if convicted. See *State ex rel. Deisinger v. Treffert* (1978), 85 Wis.2d 257, 270 N.W.2d 402 (stating that "[t]he most basic notions of due process fairness require that one found incompetent to stand trial is entitled to release when observatory confinement reaches the length of the potential maximum sentence for the underlying criminal offense").

{¶ 78} Reading the above authorities together, the principles of due process require that a defendant who is believed to be incompetent to stand trial should be evaluated to determine the defendant's competency and the likelihood that the defendant may be restored to competency in the foreseeable future. If the defendant is incompetent to stand trial and there is a reasonable likelihood that he may be restored to competency in the near future, the defendant may be committed until the earlier of (1) a reasonable period of time to restore him to competency (up to one year for serious felony offenses) or (2) the length of the maximum criminal sentence he may have received. Continued commitment must be justified by progress toward restoration to competency. If the incompetent defendant is found not to be restorable after the maximum time for restorative treatment, the treatment must end and the indictment must be dismissed. If a convicted defendant serves his sentence in a mental health facility, the defendant's commitment terminates upon the completion of the sentence absent subsequent civil commitment.

{¶ 79} Williams's commitment under R.C. 2945.39 fails to comport with due process. By its terms, R.C. 2945.39 applies only when an incompetent defendant is not restorable to competency within a reasonable period of time. Although Williams's commitment is ostensibly tied to the determination that he is a dangerous mentally ill person subject to hospitalization by court order, his commitment included attempts to restore him to competency and the required hospital reports to the trial court must indicate whether Williams has been restored to competency. Upon the determination that Williams was not restorable to competency, due process required that all efforts to restore him to competency cease. Because commitment under R.C. 2945.39 involves attempts at restoration to competency beyond a reasonable period of time to restore him to competency, commitment under R.C. 2945.39 amounts to an impermissible end run around *Jackson.*

{¶ 80} To the extent that Williams is detained for the purpose of protecting citizens from dangerous mentally ill persons, the maximum length of confinement also bears little relationship to that purpose. As stated above, an incompetent defendant committed under R.C. 2945.39 must be released, at the latest, upon the expiration of the maximum prison term or term of imprisonment that he could have received if he had been convicted of the most serious offense with which he was charged, regardless of whether there has been any improvement in his mental condition. Although the defendant may be released earlier, the maximum period of time for commitment has no relationship with the defendant's mental condition or his dangerousness to society. In this case, Williams may be committed for up to ten years under R.C. 2945.39 and then released from commitment while still a dangerous mentally ill person subject to hospitalization by court order.

{¶ 81} In addition, we agree with Williams that due process requires that the indictment against him be dismissed upon a finding that he is not restorable to competency. Although the Supreme Court in *Jackson* did not decide whether the state may keep charges pending indefinitely due to Jackson's competency commitment, the Supreme Court of Ohio in *Sullivan* indicated that an indictment must be dismissed if the defendant is not restorable to competency. *Sullivan,* 90 Ohio St.3d at 509, 739 N.E.2d 788, fn. 4. Furthermore, we find that it is fundamentally unfair for an incompetent defendant to have charges pending indefinitely when there is little hope that he may brought to trial and be exonerated. (We note that R.C. 2945.38(H)(3) and 2945.39(C) require the dismissal of the indictment against defendants over whom the trial court does not retain jurisdiction under R.C. 2945.39.)

{¶ 82} Finally, although we stated above that an incompetent defendant must be afforded the constitutional protections due to a criminal defendant, we

emphasize here that the use of the clear-and-convincing standard for determining whether an incompetent defendant committed the offense with which he was charged violates due process. While the clear-and-convincing-evidence standard may be used to find that an individual is a mentally ill person subject to hospitalization by court order, *Addington v. Texas* (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, and R.C. 2945.39, the additional finding that a person has committed a criminal offense must be made beyond a reasonable doubt. Furthermore, in light of the more substantial restrictions on a person's liberty while committed under R.C. 2945.39, the procedural safeguards afforded to a criminal defendant must be provided so that an incompetent defendant may defend himself against the indictment and to minimize the chance that he may be subjected to R.C. 2945.39 commitment erroneously. See *Commonwealth v. Burgess,* 450 Mass. 366, 375, 878 N.E.2d 921.

{¶ 83} Williams's second assignment of error is sustained.

### VII

{¶ 84} The judgment of the trial court retaining jurisdiction under R.C. 2945.39 will be reversed, and the matter will be remanded to the trial court for further proceedings.

Judgment reversed
and cause remanded.

BROGAN, J., concurs.

WOLFF, P.J., dissents.

WOLFF, Presiding Judge, dissenting.

{¶ 85} I respectfully dissent.

{¶ 86} As described in the majority opinion, R.C. 2945.39 allows the commitment of an individual found incompetent to stand trial and unrestorable to competency within a reasonable period of time. Unlike in *Jackson,* however, commitment under R.C. 2945.39 is not based solely on the defendant's incompetence. Rather, consistent with the goals of civil commitment, R.C. 2945.39 provides for the commitment of incompetent defendants who are mentally ill persons subject to hospitalization by court order.

{¶ 87} First, I agree with the trial court's conclusion that commitment under R.C. 2945.39 is civil in nature. Although R.C. 2945.39 requires a finding that the incompetent defendant committed the offense with which he was charged, that finding is used primarily as evidence of the defendant's present dangerousness to society and of the risk that he may pose to patients committed through the

probate court. See *Kansas v. Hendricks*, 521 U.S. 346, 362, 117 S.Ct. 2072, 138 L.Ed.2d 501. R.C. 2945.39 contains no scienter requirement, and it has no deterrent intent. Id. The placement of these commitment procedures within the penal code is little indication of the purpose of the statute, considering that it addresses the commitment of those who have been found incompetent to stand trial. I find most significant the fact that individuals committed under R.C. 2945.39 must be released when they have been found to be no longer a mentally ill person subject to hospitalization by court order. In my view, the release provision emphasizes that the primary purpose of R.C. 2945.39 is to provide stricter confinement for mentally ill persons who are particularly dangerous. As noted by the United States Supreme Court in *Hendricks*, the confinement of the dangerously mentally ill "is a legitimate nonpunitive governmental objective and has been historically so regarded." 521 U.S. at 363, 117 S.Ct. 2072, 138 L.Ed.2d 501. In short, I agree with the trial court that R.C. 2945.39 is merely a transfer of commitment authority to the criminal court from the probate court for mentally ill persons subject to hospitalization by court order, whose present dangerousness is demonstrated by the commission of a serious felony.

{¶ 88} Second, although I agree with the majority that R.C. 2945.39 sets forth separate and distinct procedures for commitment, I find these distinctions to be rationally related to the government's interest in confining dangerous mentally ill persons, and I find no violation of Williams's equal-protection rights. I am not persuaded that R.C. 2945.39 violates equal protection because it concerns only individuals who are under indictment and not individuals with a history of committing serious felony offenses. The legislature could rationally conclude that an individual's present involvement in the criminal-justice system indicates a greater degree of dangerousness. Moreover, because those committed under R.C. 2945.39 are particularly prone to commit serious felonies, the legislature could rationally distinguish these committees from persons committed through the probate court for purpose of release procedures. Suffice it to say, society has a substantial interest in ensuring that those individuals who have been deemed particularly dangerous truly are no longer mentally ill persons subject to hospitalization by court order prior to their release from commitment. R.C. 2945.39 provides this additional level of protection to the public.

{¶ 89} Finally, I find no due process violations based on the failure to dismiss the indictment, any continued efforts at restoring to competency, or the maximum length of commitment. Williams has been charged with rape, a first-degree felony. Because of the seriousness of this offense, the state has a substantial interest in keeping Williams under indictment and trying him should he become competent to stand trial in the future. Although the indictment against Williams may be pending for a significant period of time due to his incompetency, the

state's interest in pursuing a first-degree felony offense justifies continued jurisdiction by the trial court. I note that the state's right to keep Williams under indictment might be limited by Williams's constitutional right to a speedy trial.

{¶ 90} Although R.C. 2945.39 provides that a defendant may be committed until the expiration of the maximum term of imprisonment that he could have received for the charged offense, due process is satisfied by the fact that he may be released sooner if he is no longer subject to hospitalization by court order.

{¶ 91} Finally, while Williams is being committed for treatment of his mental illness, I see no reason why he cannot be reevaluated for competency. If Williams's competency is restored while still mentally ill, Williams could be tried on the offense while remaining committed for his mental illness. R.C. 2945.401(J)(2). The state's interest in trying Williams for the charged offense could be satisfied while Williams continues to be treated for his mental illness.

{¶ 92} Accordingly, I conclude that R.C. 2945.39 provides an alternative method of civil commitment and that it does not violate equal protection or due process. I would overrule the assignments of error and affirm the judgment.